**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Onstar, LLC,** | ) | **CASE NO. 1:08CV2047** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Micral, Inc., et al.** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

This matter is before the Court to construe certain disputed terms found in Claims 1, 2, and 6 of U.S. Patent No. 5,742,666 (hereinafter "the patent"). The Court's claim construction is set forth below.

**BACKGROUND**

Plaintiff, Onstar, LLC, brings this action against defendants, Micral, Inc., the assignee of the patent, and Martin Alpert, the inventor of the subject of the patent.

The patent claims an emergency mobile cellular telephone system. The telephone system dials a preprogrammed emergency telephone number based upon either user inputs to the system

1

or when the system senses a vehicle accident. Once the system connects to the emergency telephone number, the system repeatedly plays a prerecorded emergency message. The user has the option of interrupting the emergency message and speaking directly to the person contacted by dialing the preprogrammed emergency number. The telephone system also includes a location detector and distress signal generator that locates the telephone in an emergency and can notify the nearest emergency responder. The patent further claims configurations of different types of crash detectors.

Claim 1 of the patent is representative:

> A cellular telephone, comprising:
>
> a receiver for receiving cellular radio communications;
>
> a transmitter for transmitting cellular radio communications;
>
> a controller coupled to the receiver and to the transmitter;
>
> an operator input device coupled to the controller, the operator input device receiving operator inputs and providing operator input signals to the controller indicative of the operator inputs;
>
> an emergency input key coupled to the controller, the emergency input key receiving an operator emergency input and providing an emergency input signal to the controller indicative of the operator emergency input;
>
> a crash detector, coupled to the controller, sensing parameters indicative of a crash and providing a crash signal to the controller indicative of the parameters sensed;
>
> a first memory coupled to the controller and storing a pre-programmed telephone number corresponding to an emergency responder;
>
> a second memory coupled to the controller and storing a pre-recorded emergency message including identification

2

>information associated with a user of the cellular telephone;
>
>a microphone coupled to the controller and providing voice signals to the controller in response to the user speaking into the microphone;
>
>wherein the controller is configured to detect a distress situation based on inputs from the emergency input key and the crash detector, and to access the first memory and initiate cellular communication using the pre-programmed telephone number and to access the second memory and play the pre-recorded message repeatedly once cellular communication has been initiated and established with the emergency responder, and wherein the controller is further configured to stop playing the pre-recorded message and transmit voice information based on inputs from the microphone and the operator input device.

Plaintiff's Second Amended Complaint contains three claims for relief.  Count One seeks a declaratory judgment that the patent is invalid.  Count Two seeks a declaratory judgment that the patent is unenforceable.  Count Three seeks a declaratory judgment that plaintiff has not infringed the patent.  Defendants' Second Amended Counterclaim alleges that plaintiff is infringing the patent, and/or is inducing others to infringe the patent, and/or is contributing to the infringement of the patent by others.  Defendants further allege that plaintiff's infringement is willful.

Plaintiff and defendant Micral, Inc. (hereinafter "defendant") now ask the Court to construe certain disputed claim terms.

**STANDARD OF REVIEW**

"[T]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court."  *Markman v. Westview Instruments*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

3

(1996). "To ascertain the meaning of claims, [the court considers] three sources: The claims, the specification, and the prosecution history." *Markman*, 52 F.3d at 979. The words of a claim are generally given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The ordinary and customary meaning is to be determined from the perspective of one of ordinary skill in the art at the time of the invention. *Id.* at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Accordingly, the court first looks to the claim itself, read in view of the specification. *Id.* at 1315 ( "The specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The court may look to the written description to define a term already in a claim limitation, but the court may not read a limitation from the written description into a claim. *Id.* at 1323.

As stated above, the prosecution history should also be considered by the court when construing claims. *Phillips*, 415 F.3d at 1317. The "prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id. See also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution."). A statement made during prosecution will constitute a surrender of claim scope if the disclaimer is "clear and

4

unmistakable" and "unambiguous." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005). Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers. *Chimie*, 402 F.3d at 1384. Moreover, the prosecution history of a parent application applies with equal force to a later patent that contains the same claim limitation. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). *See also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (stating that "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application"). "The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor Corp. v. Fas Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998).

All other evidence is considered extrinsic and may be relied upon by the court in its discretion. *Markman*, 52 F.3d at 980; *Phillips*, 415 F.3d at 1317. Extrinsic evidence, however, is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318. Thus, the court should restrict its reliance on extrinsic evidence to educating itself regarding the field of invention or to determining what a person of ordinary skill in the art would have understood the claim terms to mean. *Id.* at 1319. *See also Markman*, 52 F.3d at 986 ("It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed."). Extrinsic evidence may not be used for the purpose of varying or contradicting the terms of the claims. *Markman*, 52 F.3d at 981.

As a result, excessive reliance should not be placed on dictionaries. *Phillips*, 415 F.3d at 1321. "The main problem with elevating the dictionary to such prominence is that it focuses the

inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. . . . [H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id.*

**DISCUSSION**

The parties dispute the meaning of five terms found in the claims of the patent.[1]

1. "emergency responder"

Plaintiff's Proposed Construction: "police, sheriff, paramedic or fire department, as well as a dispatcher or operator maintained at a central control station of such police, sheriff, paramedic or fire department"

Defendant's Proposed Construction: "an emergency services provider such as police, sheriff, paramedic or fire department as well as a dispatcher or operator maintained at central control stations"

Discussion and Court's Construction: Plaintiff's proposed construction seeking to limit "emergency responder" to the police, the sheriff, the paramedics, the fire department, or their central dispatchers is too narrow. The detailed description of a preferred embodiment contemplates a central dispatcher that is not controlled by these emergency services:

> If the preprogrammed emergency number is the telephone number of the police or sheriff's department, information on the location of the user is received directly, and help can be provided. *Alternatively, the emergency telephone number can be a dedicated telephone number within the system 10.* A central dispatcher at the

---

[1] Claims 1 and 6 are independent claims, but are virtually identical with the exception of a base station being claimed in Claim 6; thus, disputed terms in Claim 1 also appear in Claim 6. Claim 2 depends from Claim 1.

> central control station receives the emergency call, records the
> relevant location information, and dispatches help by way of the
> appropriate authorities.

(5:29-39, emphasis added.) Additionally, the specification states that "[t]he emergency telephone number can be that of the police, the sheriff's department, 911, *a dedicated emergency service number offered by the cellular telephone system 10*, or the like." (7:25-27, emphasis added.)

Defendant's proposed construction is also too narrow. Defendant's construction limits the emergency responder to an emergency services provider or to a dispatcher or controller at a central control station. These embodiments are both described in the detailed description of a preferred embodiment, but the description also identifies an emergency responder as a family member or any other person that the user chooses by programming that person's telephone number as the emergency telephone number: "The preprogrammed telephone number could be that of the police, an emergency 911 service, an emergency service provided by the cellular telephone system, a family member, etc." (6:35-38. *See also* 7:25-27.) Such persons would be excluded from the scope of the claim if the Court adopted defendant's proposed construction. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is 'rarely, if ever, correct.'" *Globetrotter Software, Inc., v. Elan Computer Group,* 362 F.3d 1367, 1381 (Fed. Cir. 2004) (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

Upon review, the Court finds that neither party's proposed construction properly construes the claim. Claim 1 states that the cellular telephone is comprised (in part) of "a first memory coupled to the controller and storing a pre-programmed telephone number

7

corresponding to an emergency responder."  As discussed above, "[t]he preprogrammed telephone number could be that of the police, an emergency 911 service, an emergency service provided by the cellular telephone system, a family member, etc." (6:35-38.)  Neither the detailed description nor the claim language limits the scope of who the emergency responder can be.

The Court thus construes "emergency responder" as "the person or entity contacted by dialing the pre-programmed emergency number."

2. "pre-recorded emergency message"

Plaintiff's Proposed Construction:  "a voice-based message recorded prior to an emergency situation, for the purpose of playing in an emergency situation"

Defendant's Proposed Construction:  "information stored prior to an emergency situation to be communicated in the event of an emergency situation"

Discussion and Court's Construction:  The Court notes that defendant does not believe this term needs construing but submits its own construction should the Court find that the jury would benefit from construction.  The parties agree that a "pre-recorded emergency message" is created and recorded and/or stored prior to an emergency situation, for use in an emergency situation.  Additionally, neither party proposes a construction of "emergency."  The parties disagree, however, on what constitutes a "message."  The Court agrees with plaintiff that the jury would benefit from the Court construing this term.

Plaintiff argues that "message" must be construed as a "voice-based message."  If the message is merely data, such as an electronic signal containing a vehicle identification number, and not a voice recording, such data is simply "stored."  The data is not "pre-recorded" and *then*

8

stored, which causes the term "pre-recorded" to be superfluous in the claim. Plaintiff also argues that the message must ultimately be "played," and that data cannot be played– it is instead transmitted. Finally, plaintiff argues that "information stored" is covered by the prior art of the Tendler patent (U.S. Patent No. 5,555,286).

Defendant argues that a construction of "pre-recorded emergency message" that does not include the transmission of an electronic signal such as a vehicle identification number should be rejected as overly narrow. Defendant argues that plaintiff's construction limiting "message" to "voice-based message" impermissibly attempts to import limitations from the preferred embodiment into the claims, as the specification provides no clear disavowal of the plain language of the claims. Defendant further argues that the United States Patent and Trademark Office (hereinafter "USPTO") did not reject Claim 1 on the basis that it was covered by the prior art of the Tendler patent.[2]

Upon review, the Court finds that a person having ordinary skill in the art would understand "message" as used in the patent to mean "voice message." Defendant is correct that the Court may not read a limitation from the specification into a claim. *Phillips*, 415 F.3d at 1323. Claims, however, do not have meaning apart from the specification. *Id.* at 1316 (citing *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.")). "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed

---

[2] No correspondence between the patentee and the USPTO has been submitted as evidence by either party.

9

invention in 'full, clear, concise, and exact terms.'" *Id.* (quoting 35 U.S.C. § 112). Because the statute requires that the inventor give a complete, exact description, "the specification necessarily informs the proper construction of the claims." *Id.* (citing *Merck and Co. v. Teva Pharms. USA, Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.")). Thus, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct description.'" *Id.* (quoting *Reninshaw PLC v. Marposs Societa per Azioni,* 158 F.3d 1243, 1249 (Fed. Cir. 1998)).

The Court declines to accept defendant's proposed construction substituting "information" for "message." A person having ordinary skill in the art would understand "message" to be different from "information" in the context of the entire patent. In the patent, "information" is generally used to refer to data, such as location information obtained from the location detector or the information obtained from a distress signal. (*See, e.g.,* 5:23-54.) Such data is often transmitted at or near the time it is generated. When this data is saved for later access, the data is generally referred to as "stored," while the emergency message is "recorded" or "pre-recorded," and then stored. (*See, e.g.,* 15:54-57 and Fig. 9, referencing "storing" and "transmitting" location identification data.) The patent also discusses at length the recorder used to record the message, which is separate from the memory in which the recorded message is then stored. (7:61-8:16.)

Moreover, whenever the specification uses the term "message," it refers to a voice message. In the summary of the invention, the patent states that "the cellular telephone plays a recorded message which indicates that an emergency has occurred and that the cellular telephone

10

user is in distress." (3:16-18.) The preferred embodiment indicates that this message is replayed continuously over the *voice* channel to the receiving party. (10:21-22, emphasis added.) The preferred embodiment states at least twice that the user can "interrupt the transmission of the prerecorded message *so that the user may provide his or her own message.*" (5:21-23, emphasis added; *see also* 6:43-45.) The preferred embodiment goes on to state that the user overrides the transmission of the emergency message "by speaking into the microphone," confirming that the user's "own message" is a voice message. (10:45-46). Additionally, the patent details the process of recording the message, during which "the user speaks into the microphone." (9:4-56.) Nowhere does the specification use "message" to refer to any data other than a voice message. This is in contrast to "information," which is used to refer to voice information, distress information, and location information. (*See* 15:35-39 ("After the connection is determined to have been made in step 158, the cellular telephone 50 in step 160 transmits the emergency message to the receiving party along with the location information determined in step 152.")).

      Such consistent usage of a claim term can be definitional without an express disavowal of the claim scope in the written description. *Nystrom v. Trex Co., Inc.,* 424 F.3d 1136, 1145 (Fed. Cir. 2005). In *Nystrom*, the plaintiff argued that the district court's construction of the term "board" as a wood board was too narrow, as the claim language did not contain a description of the material from which the board was made and neither the specification or the prosecution history revealed a disavowal of the claim scope; additionally, the plaintiff's definition could be supported by a dictionary definition. *Id.* at 1142. The written description and the prosecution history, however, consistently used the term "board" to refer to wood boards. *Id.* at 1145. The court held the following:

11

> [I]n the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public– i.e. those of ordinary skill in the art– that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the content of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

*Id.*  In this case, defendant argues that limiting "message" to a voice message is impermissible because the written description contains no clear disavowal of the scope, and that "message" can mean an electronic signal.  Defendant provides no intrinsic or extrinsic evidence that supports broadening "message" to include anything other than a voice message, which is the ordinary and customary meaning revealed by the intrinsic record, even without a disavowal of the claim's scope.

The Court thus finds that the construction of "message" that most naturally aligns with the patent's description of the invention is "voice message."  Therefore, the Court construes the term "pre-recorded emergency message" to mean "pre-recorded emergency voice message."

3.    "identification information associated with a user of the cellular telephone"

Plaintiff's Proposed Construction:  "information associated with the identity of a user of the cellular telephone, as opposed to the identity of the cellular telephone"

Defendant's Proposed Construction:  "information from which the identity of a user of the cellular telephone can be determined"

Upon review, the Court finds that this term needs no construction.  It will readily be understood by one of ordinary skill in the art and by a jury.  There are no technical terms or processes that need clarification.  Moreover, plaintiff's attempt to limit the type of identification information that is associated with a user of a cellular telephone is not supported by the

12

evidence. Defendant's proposed construction does not add meaningfully to the definition of the claim.

4. "wherein the controller is further configured to stop playing the pre-recorded message and transmit voice information based on inputs from the microphone and the operator input device"

Plaintiff's Proposed Construction: "the controller is further configured (1) to stop playing the pre-recorded message during a cellular telephone call based on receiving inputs from both the microphone and the operator input device; and (2) to transmit voice information during the same cellular telephone call based on inputs from both the microphone and the operator input device"

Defendant's Proposed Construction: "(1) the controller is further configured to stop playing the pre-recorded message based on inputs from the microphone and the operator input device; and (2) the controller is also configured to transmit voice information based on inputs from the microphone and the operator input device"

Discussion and the Court's Construction: The Court notes that defendant does not believe this term needs construing but submits its own construction should the Court find that the jury would benefit from construction.

Plaintiff and defendant dispute whether the claim language means that the emergency message must be interrupted and voice information transmitted in the course of one telephone call. Plaintiff argues that both functions described in the claim– stop playing the emergency message and transmit voice information– must occur during the same call. Based upon that argument, plaintiff seeks to add "during the same cellular telephone call" to the claim.

13

Defendant objects to this language, arguing that plaintiff is importing limitations from the preferred embodiment into the claims, and that the claim language "transmit voice information" means that the cellular telephone system is also a typical cellular telephone capable of transmitting voice and receiving audio signals via a microphone and an earpiece.

The disputed language occurs as part of a larger description of what the cellular telephone does when it detects an emergency:

> [W]herein the controller is configured to detect a distress situation based on inputs from the emergency input key and the crash detector, and to access the first memory and initiate cellular communication using the pre-programmed telephone number and to access the second memory and play the pre-recorded message repeatedly once cellular communication has been initiated and established with the emergency responder, and wherein the controller is further configured to stop playing the pre-recorded message and transmit voice information based on inputs from the microphone and the operator input device.

(16:49-60.) The Court finds that the context of the claim is a single emergency cellular telephone call. Adding "during the same cellular telephone call" to the claim is unnecessary and would not be helpful to the jury. The Court thus declines to adopt the "during the same cellular telephone call" language that plaintiff proposes.

Plaintiff and defendant seem to agree that the controller must be configured to stop playing the emergency message based on inputs from both the operator input device and the microphone. In other words, unless the controller receives inputs from both the microphone and the operator input device, the emergency message will continue to play. This construction, however, is inconsistent with the detailed description of a preferred embodiment, which indicates that the emergency message can be interrupted with inputs from just the operator input device:

> When the emergency call is dialed and connected through the

14

> transceiver 54, a prerecorded message which is digitally or
> otherwise stored in the memory of the cellular telephone 50 is
> communicated over the cellular telephone link to the receiving
> party.  The user can interrupt the prerecorded message and provide
> his or her own message by pressing a predetermined interrupt
> code.  Such a code can be a single function key or a sequence of
> keys.  The sequence may consist of one or more digit keys and/or
> the "#" or "*" keys.  Alternatively, the interrupt code can be
> provided by a single dedicated interrupt key 65.

(6:39-49.)  No inputs from the microphone are necessary to interrupt the emergency message.

This is also apparent from another description of this function:

> While the cellular telephone 50 is in step 120, the user in distress
> has the option of interrupting the playing of the emergency
> message and instead talking with the receiving party.  If the user is
> conscious he or she may be able to describe the emergency and/or
> to communicate his or her location so that help can be provided.
> In order to interrupt the emergency message, the user simply
> depresses the appropriate key or sequence of keys on the handset
> 52 as described above.  A sequence detector programmed into the
> control unit 70 will detect the interrupt sequence and allow the
> user to override the transmission of the emergency message by
> speaking into the microphone.

(10:35-46.)  The context shows that the message is interrupted by the sequence detector before the user begins to speak into the microphone.  Thus, the Court declines to add "both" to the claim language as plaintiff proposes, and also declines to adopt the parties' proposed constructions that rewrite the term into two separate clauses.

     Upon review, the Court finds that a person having ordinary skill in the art would understand the disputed language to be directed toward enabling the user to speak to the emergency responder.  If the user only wanted to stop playing the emergency message, the user could simply "hang up" the call as described in the specification: "Alternatively, in step 121, the user may want to terminate the emergency dialing/message.  The user simply depresses a

dedicated function key or sequence of keys, resulting in an asynchronous event represented by line 121*a* which causes the control unit 70 in the cellular telephone 50 to return to state A." (10:47-52.)  The user need not provide inputs to the microphone to simply terminate the emergency message.

The "stop playing" function described in the term, however, is a prerequisite to the "transmit voice" function, and a function that the user would not initiate except if the user's ultimate goal was to speak to the emergency responder.  A person having ordinary skill in the art would understand that the two functions described are not separate functions, but a process that must be followed to enable the user to transmit voice information. Both types of inputs– operator input device and microphone– must occur in order to transmit voice information.  Transmitting voice information cannot occur without the user inputting the interrupt sequence, and the user would not input the interrupt sequence without intending to transmit voice information.  It changes the meaning of the term to separate it into two stand-alone functions as both plaintiff and defendant have proposed.

The Court finds that this term will be readily understood by a person having ordinary skill in the art and by the jury.  The Court declines to construe this term.

5. <u>"impact detector coupled to the controller and configured to be coupled to at least one of the front and rear bumpers"</u>

<u>Plaintiff's Proposed Construction</u>:  "a mechanical sensor in communication with the controller and mounted on the front and/or rear bumpers of the vehicle"

<u>Defendant's Proposed Construction</u>:  "a crash sensor in communication with the controller and positioned to sense an impact at either or both bumpers"

16

Discussion and Court's Construction: Upon review, the Court finds that this term needs no construction. The term will be readily understood by a person having ordinary skill in the art and by the jury.

Plaintiff's proposed construction, which requires the impact detector to be mounted on the front or rear bumper, imposes limitations that are not supported by the evidence. Plaintiff contends that "coupled" to one of the bumpers must mean that the impact detector is mounted on the bumper because any "crash detector" is coupled to a bumper to the extent that "coupled" means it senses a collision. While the only impact detector described in the specification consists of "a mechanical sensor 66*d* (shown in Fig. 3A) on the front and/or rear bumper of the vehicle," the specification goes on to say that "[a] variety of mechanisms for use as a crash detector 66 will be apparent to those having ordinary skill in the art in view of the present disclosure and are within the intended scope of the present invention." (7:2-8.) "Crash detector" encompasses "impact detector." (6:66-7:5.) Thus, neither the detailed description of a preferred embodiment nor the claim language itself limit "impact detector" to a sensor that must be mounted on a front or rear bumper, or even to a mechanical sensor. Moreover, the plaintiff itself recognizes that "coupled" can mean "in communication with," as demonstrated by its proposed construction. "Coupled" is used throughout the patent to describe a variety of connections between elements of the invention and can easily be understood in context by a person having ordinary skill in the art.

Defendant's proposed construction of "impact detector" as a crash sensor that senses an impact adds nothing meaningful or helpful to the definition of the claim, as Claim 2 already describes the impact detector as being comprised of a crash sensor. The Court declines to

17

construe this term.

### **CONCLUSION**

For the foregoing reasons, the Court construes the disputed claim terms as follows:

The term "emergency responder" is construed as "the person or entity contacted by dialing the pre-programmed emergency number."

The term "pre-recorded emergency message" is construed as "pre-recorded emergency voice message."

The term "identification information associated with a user of the cellular telephone" needs no construction.

The term "wherein the controller is further configured to stop playing the pre-recorded message and transmit voice information based on inputs from the microphone and the operator input device" needs no construction.

The term "impact detector coupled to the controller and configured to be coupled to at least one of the front and rear bumpers" needs no construction.

IT IS SO ORDERED.


          /s/ Patricia A. Gaughan
         PATRICIA A. GAUGHAN
         United States District Judge

Dated: 8/21/09