**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Onstar, LLC, | ) | **CASE NO. 1:08 CV 2047** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| Micral, Inc., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon plaintiff's Merits Brief in Support of Its Request for

Entry of Judgment of Unenforceability (Doc. 77) and defendant's Opposition to Plaintiff's

Merits Brief in Support of its Motion for Entry of Judgment of Unenforceability (Doc. 81).  This

is a patent infringement dispute.  For the reasons set forth below, the Court finds that the patent

is UNENFORCEABLE due to inequitable conduct.

**FACTS**

Plaintiff, Onstar, LLC, brings this action against defendants, Micral, Inc.(hereinafter

"defendant"), the assignee of U.S. Patent No. 5,742,666 (hereinafter "the patent"), and Martin

Alpert, the inventor of the subject of the patent.  The Court granted Alpert summary judgment on the claims against him in its February 24, 2010 Memorandum of Opinion and Order.

The patent claims an emergency mobile cellular telephone system.  The telephone system dials a preprogrammed emergency telephone number based upon either user inputs to the system or when the system senses a vehicle accident.  Once the system connects to the emergency telephone number, the system repeatedly plays a prerecorded emergency message.  The user has the option of interrupting the emergency message and speaking directly to the person contacted by dialing the preprogrammed emergency number.  The telephone system also includes a location detector and distress signal generator that locates the telephone in an emergency and can notify the nearest emergency responder.  The patent further claims configurations of different types of crash detectors.

Claim 1 of the patent is representative:

A cellular telephone, comprising:

a receiver for receiving cellular radio communications;

a transmitter for transmitting cellular radio communications;

a controller coupled to the receiver and to the transmitter;

an operator input device coupled to the controller, the operator input device receiving operator inputs and providing operator input signals to the controller indicative of the operator inputs;

an emergency input key coupled to the controller, the emergency input key receiving an operator emergency input and providing an emergency input signal to the controller indicative of the operator emergency input;

a crash detector, coupled to the controller, sensing parameters indicative of a crash and providing a crash signal to the

controller indicative of the parameters sensed;

a first memory coupled to the controller and storing a pre-
programmed telephone number corresponding to an
emergency responder;

a second memory coupled to the controller and storing a pre-
recorded emergency message including identification
information associated with a user of the cellular telephone;

a microphone coupled to the controller and providing voice signals
to the controller in response to the user speaking into the
microphone;

wherein the controller is configured to detect a distress situation
based on inputs from the emergency input key and the
crash detector, and to access the first memory and initiate
cellular communication using the pre-programmed
telephone number and to access the second memory and
play the pre-recorded message repeatedly once cellular
communication has been initiated and established with the
emergency responder, and wherein the controller is further
configured to stop playing the pre-recorded message and
transmit voice information based on inputs from the
microphone and the operator input device.

The Court construed the following claim terms in its August 21, 2009 order:  "emergency

responder" is construed as "the person or entity contacted by dialing the pre-programmed

emergency number"; and "pre-recorded emergency message" is construed as "pre-recorded

emergency voice message."

The following facts are taken from plaintiff's Statement of Undisputed Material Facts

Concerning the Issue of Inequitable Conduct (Doc. 76) and its supporting exhibits, with which

defendant has indicated it agrees.[1]  The patent issued on April 21, 1998, following two separate

---

[1]     Defendant disagrees only with the characterization of the Mitchell patent as
"highly material" as stated in paragraphs 55-57 of the statement of facts, and with the recital
of expert opinion testimony as fact in paragraphs 64-66.  The Court notes that whether the

3

applications.  Cumulus Corp., to whom Alpert assigned the patent application, first applied for a patent on Alpert's invention on November 19, 1991, through its counsel Renner, Otto, Boiselle & Sklar.  The Patent Office assigned the application serial number 07/794,389 (hereinafter "the '389 application").  The Patent Office rejected all 31 claims of the '389 application in an Office Action dated June 18, 1992.  The examiner, Stella Woo, found that claims 1-4 and 9-12 were unpatentable because they were anticipated by U.S. Patent No. 4,904,983 (hereinafter "the Mitchell patent"); that claims 5-8 were unpatentable because they were obvious in light of the Mitchell patent; and that claims 13-31 were unpatentable because they were obvious in light of the Mitchell patent combined with U.S. Patent No. 5,081,667 (hereinafter "the Drori patent").  The Patent Office gave Cumulus three months to respond to the Office Action.  Cumulus's attorney notified it of the rejection and suggested that Cumulus amend the claims, but Cumulus failed to respond to the Office Action due to financial troubles.  The Patent Office issued a Notice of Abandonment of the '389 application on January 25, 1993.

While the '389 application was pending, Cumulus filed for bankruptcy.  Controller Acquisition Corporation (hereinafter "CAC") purchased the abandoned '389 application from the assets of Cumulus.  CAC subsequently changed its name to Tele Digital Development, Inc. (hereinafter "TDD").  TDD hired patent counsel in early 1994 to work on the abandoned '389 application.  Joseph Kelly of Westman, Champlin and Kelly filed a new patent application with serial number 317,663 (hereinafter "the '663 application") for TDD on October 5, 1994, with exactly the same claims as the '389 application.  Rudolph Hoffmann assisted Kelly in

_____

Mitchell patent is material is for the Court to decide, and that the expert opinion testimony is opinion, not fact, and will consider these statements accordingly.

prosecuting the '663 application.

Nineteen days later, on October 24, 1994, Kelly petitioned the Patent Office to revive the '389 application based on unavoidable abandonment, and included an Amendment responding to the June 18, 1992 Office Action.  The Amendment amended claims 1-12, 14-23, and 25-31, and canceled claims 13 and 24.  The Amendment stated "[i]t is believed that the present invention, as set out in the amended claims, is clearly distinguishable over Mitchell."  The Petition to Revive was ultimately rejected by the Patent Office's Special Program Law Office on March 31, 1995.

Because Alpert, the inventor, refused to participate in prosecuting the '663 application, on April 5, 1995, Kelly filed a Petition to Make Application on Behalf of and as Agent for Sole Inventor Who Refuses to Sign under 37 C.F.R. § 1.47(b) (hereinafter "the Rule 47(b) Petition").  He attached to the Rule 47(b) Petition a declaration to which was attached the purchase agreement between Cumulus and CAC for the '389 application and other assets.  The Application Branch of the Patent Office initially refused Rule 47(b) status on September 14, 1995, as TDD failed to show a sufficient proprietary interest in the subject matter of the '663 application because the purchase agreement referred to the '389 application, not the '663 application.  Kelly responded to the Patent Office's decision on November 15, 1995, by submitting Hoffmann's supplementary declaration describing the chain of title of the '389 application and asserting that the subject matter of the '389 application and the '663 application are the same.  Hoffmann also stated in the declaration that he had been involved in the prosecution of the '389 application.  On May 13, 1996, the Special Program Law Office of the Patent Office granted status under Rule 47(b) and authorized the Application Branch to pass the '663 application to the Examination Branch, where it was assigned to Examiner William

Cumming.

On August 2, 1996, the Patent Office issued an Office Action requiring TDD to restrict its application to claims 1-22 or to claims 23-31, as Examiner Cumming found that two different inventions were claimed.  Kelly responded by electing examination of claims 1-22.  All claims were rejected by the Patent Office on October 22, 1996, as being anticipated by or unpatentable over existing patents.  Examiner Cumming did not cite the Mitchell patent in the rejection.  Kelly filed an amendment in response to the Office Action on April 22, 1997, canceling claims 1-22 and adding new claims 32-40.  The Patent Office issued a Notice of Allowability for claims 32-40, renumbered as claims 1-8, and on April 21, 1998, the '663 application issued as the patent.  While the '663 application was pending, neither Kelly nor anyone else cited the Mitchell patent to the examiner.  TDD subsequently assigned the patent to defendant.

## **LAW AND ANALYSIS**

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the [Patent Office] during prosecution."  *McKesson Information Solutions, Inc., v. Bridge Medical Inc.,* 487 F.3d 897, 913 (Fed. Cir. 2007).  The duty to provide material information to the Patent Office arises under 37 C.F.R. § 1.56(a),[2] which instructs that an individual[3] associated with the filing and prosecution of a patent has a duty of candor and

_____

[2]     The provisions of 37 C.F.R. § 1.56 relating to materiality and duty of candor remain largely unchanged since 1992. The regulation was amended in 2000 to add a provision dealing with continuation-in-part applications that is not relevant to the case at hand.

[3]     Individuals associated with the filing or prosecution of a patent within the meaning of 37 C.F.R. § 1.56(a) include:  each inventor named in the application; each attorney or agent who prepares or prosecutes the application; and every other person who is

6

good faith in dealing with the Patent Office.  This duty of candor requires the individual "to disclose to the [Patent] Office all information known to that individual to be material to patentability[.]"

In this case, plaintiff as the accused infringer has the burden to prove inequitable conduct. The accused infringer must prove by clear and convincing evidence that the patent applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information; and (2) the applicant intended to deceive the Patent Office. *Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365 (Fed. Cir. 2008) (citing *Cargill, Inc. v. Canbra Foods, Ltd.,* 476 F.3d 1359, 1364-65 (Fed. Cir. 2007)).  If the accused infringer meets the threshold burden of establishing both materiality and intent by clear and convincing evidence, the district court must balance the equities to determine whether the applicant's conduct was so egregious as to warrant holding the patent unenforceable.  *Id.* (citing *Monsanto Co. v. Bayer BioScience B.V.,* 363 F.3d 1235, 1239 (Fed. Cir. 2004)).

Plaintiff argues that the patent was procured through Kelly's inequitable conduct, which plaintiff argues consists of withholding the Mitchell patent, the Office Action rejecting the claims of the '389 application (hereinafter "the Office Action"), and the Amendment Kelly filed with the Petition to Revive the '389 application (hereinafter "the Amendment").  While defendant agrees that this information is material, it argues that Kelly had no intent to deceive the Patent Office and acted in good faith.  The Court addresses each element of inequitable conduct in turn.

_____

substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the application.  37 C.F.R. § 1.56(c).

**A.      Materiality**

Information is material when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.  *Id.* at 1367 (citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d 1279, 1297 (Fed. Cir. 2008).  In evaluating materiality, the court refers to the standard of materiality set forth in 37 C.F.R. § 1.56(b):

> Information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) it refutes, or is inconsistent with, a position the applicant takes in:
>
> > (i) opposing an argument of unpatentability relied on by the Office, or
> >
> > (ii) asserting an argument of patentability.

*Monsanto Co.,* 514 F.3d at 1237.  "A misstatement or omission that is material under the [37 C.F.R. § 1.56] standard is considered material for the purposes of the inequitable conduct inquiry."  *Id.*  If a misstatement or omission does not meet the standard of materiality set forth under § 1.56(b), however, it can be material for purposes of the inequitable conduct inquiry if, in the totality of the circumstances, a reasonable examiner would have considered such information important in deciding whether to allow the application.  *Id.* (citing *Digital Control Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1314 (Fed. Cir. 2006)).

8

The parties do not dispute materiality.[4]  Upon review, the Court agrees that the information comprised of the Mitchell patent, the Office Action, and the Amendment is material. A contrary decision of another examiner reviewing a substantially similar claim meets both the reasonable examiner standard and the § 1.56(b)(2) standard in that it refutes, or is inconsistent with, a position the applicant takes in asserting an argument of patentability.  *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003).  Thus, the Office Action rejecting all 31 claims of the '389 application based on prior art is material to the '663 application, because the '663 application contained exactly the same claims as the '389 application.  The Mitchell patent, as the primary basis for the examiner's rejection of the same claims, is also material under the reasonable examiner standard and under § 1.56(b)(2).  Finally, the Amendment is material under 1.56(b) because it illustrates that Kelly was taking contrary positions with respect to the same claims:  in the '389 Petition to Revive he proposed amending the original claims to overcome the examiner's finding of unpatentability in light of Mitchell without opposing the examiner's arguments, while in the '663 application he asserted that the original claims were patentable.  Accordingly, plaintiff has shown by clear and convincing evidence that the Office Action, the Mitchell patent, and the Amendment are material.

**B.      Intent to Deceive**

Materiality does not presume intent.  *Star Scientific,* 537 F.3d at 1366 (citing *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1274 (Fed. Cir. 2001)).  The accused infringer must prove the applicant had the specific intent to mislead or deceive the Patent Office.  *Id.* (citing *Molins PLC*

---

[4]      As explained in Note 1, defendant disagrees with plaintiff's characterization of the information as "highly" material.

9

*v. Textron, Inc.,* 48 F.3d 1172, 1181 (Fed. Cir. 1995)).  The applicant's withholding of material

information cannot by itself show deceptive intent.  *Id.* (citing *M. Eagles Tool Warehouse, Inc. v.*

*Fisher Tooling Co.,* 439 F.3d 1335, 1340 (Fed. Cir. 2006); *Kingsdown Med. Consultants, Ltd. v.*

*Hollister Inc.,* 863 F.2d 867, 876 (Fed. Cir. 1988) (holding that even gross negligence is

insufficient to prove intent to deceive)).  *See also Dayco Prods.,* 329 F.3d at 1367 ("Intent to

deceive cannot be inferred simply from the decision to withhold the reference where the reasons

given for the withholding are plausible.").

Deceptive intent may be inferred from indirect and circumstantial evidence; indeed,

direct evidence of deceptive intent is rarely available.  *Id.* (citing *Cargill,* 476 F.3d at 1364).

"But such evidence must still be clear and convincing, and inferences drawn from lesser

evidence cannot satisfy the deceptive intent requirement."  *Id.* (citing *Ferring B.V. v. Barr Labs,*

437 F.3d 1181, 1186 (Fed. Cir. 2006)).  To meet the clear and convincing standard, an inference

of deceptive intent must be based on sufficient evidence, be reasonable in light of that evidence,

and be the single most reasonable inference able to be drawn from the evidence.  *Id.* (citing

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp.,* 528 F.3d 1365 (Fed. Cir. 2008)).

Plaintiff argues that intent to deceive can be inferred from a pattern of failing to comply

with obligations to the Patent Office, and that the chronology surrounding the filing of the '663

application and the Petition to Revive the '389 application support inferring an intent to deceive

the Patent Office.  Plaintiff points to the 19-day interval of time between filing the '663

application and filing the '389 Petition to Revive and argues that this fact establishes that Kelly

was well aware of the Mitchell patent and the Office Action rejecting the '389 claims, although

he did not cite this information in the '663 application.  Plaintiff also argues that Kelly's

statement in response to the restriction requirement during the prosecution of the '663 application that "[i]t is believed that [claims 1-22] are allowable over the art of record" would have been false if Kelly had not withheld the Mitchell patent, and was intended to deceive Examiner Cumming. Plaintiff further argues that the rejection of the restricted claims of the '663 application without the examiner's citation to Mitchell should have prompted Kelly to cite Mitchell to Examiner Cumming because the exact same claims were rejected based on Mitchell in the '389 application. Plaintiff also argues that Kelly's addition of new claims 32-40 and cancellation of the original claims instead of citing to Mitchell demonstrated that Kelly knew the strength of the Mitchell patent. Further, plaintiff argues that in adding claims 32-40 Kelly stated the references cited by the examiner did not teach or render obvious the new claims, but the Mitchell patent discloses the combination of features in the new claims, and thus it is reasonable to infer that Kelly withheld the Mitchell patent with intent to deceive the Patent Office. Finally, plaintiff argues that no plausible explanation has been offered as to why this information was withheld.

Defendant argues that Kelly disclosed the existence of the '389 application to the Patent Office in the Rule 47(b) Petition. Defendant acknowledges that normally an attorney would list prior art on an Information Disclosure Statement, but argues that in this case, the Patent Office was given sufficient information in the Rule 47(b) Petition to find the '389 application. Defendant argues that nothing in the record shows that Examiner Cumming did not know about the '389 application. Further, defendant argues that Kelly's deposition testimony shows that Kelly sincerely believed he satisfied his duty of candor to the Patent Office by citing the '389 application in the Rule 47(b) Petition, his actions were in good faith, and thus one cannot infer

11

an intent to deceive.

Upon review, the Court finds that plaintiff has shown by clear and convincing evidence that Kelly intended to deceive the Patent Office.  As set forth below, the Court finds that intent to deceive is the single most reasonable inference that can be drawn from the following facts:  the 19-day period between the filing of the '663 application containing the original claims and filing the Petition to Revive the '389 application containing the proposed Amendment to overcome the examiner's objections to the original claims; Kelly's awareness of and yet failure to cite the Mitchell patent, the Office Action, or the Amendment at any time during the prosecution of the '663 application; the misleading characterization of the status of the '389 application in the Rule 47(b) Petition; and Kelly's response to the '663 restriction requirement stating that claims 1-22 were allowable over the art of record, while being aware that material prior art and information that would foreclose such an argument were not "of record."

Kelly filed the '663 application on October 5, 1994, with exactly the same claims that were rejected as unpatentable in the '389 application in light of the Mitchell patent or a combination of Mitchell and the Drori patent.  Nineteen days later he filed the Petition to Revive the '389 application with the Amendment designed to overcome the rejection of the claims in light of Mitchell.  This short time frame shows that when Kelly filed the '663 application, he was completely aware that the same claims had been rejected based on Mitchell.  Indeed, defendant does not dispute this.[5]  Kelly's deposition testimony also confirms that he was aware of the

---

[5]     Defendant states in its opposition brief:  "While prosecution counsel does not dispute that he had the '389 Application and the associated documents during the prosecution of the '666 Patent, he testified that he believes he cited all of this information to the patent examiner via the uncooperative inventor declaration."

12

Office Action before he filed the '663 application:

> Q.   At the point in time directly before the '663 application was filed and during the pendency of the '663 application, did you have a copy of the '389 application prosecution history?
>
> A.   I had part of it I believe.
>
> Q.   Which part did you have?
>
> A.   I don't know exactly– I don't know exactly what I had.  I think I had the application for sure, and I had parts of the prosecution history up to where it went abandoned.
>
> Q.   Does "parts of the prosecution history" include a copy of the office action?
>
> A.   Yes.

(Kelly Deposition Transcript 23:6-19.)  Kelly further testified:

> Q.   Did you have a copy of this office action while you were prosecuting the '663 application?
>
> A.   I recall that we had a copy of an office action.  I have not reviewed the substance of it for– of our files for, you know, 12, 14 years.  So I don't know if it was this one or . . .
>
> Q.   Are you– there's– are you aware of any other office actions?
>
> A.   I– I recall having a copy of one office action.  That's all I can say.  I don't recall whether there were other office actions or not, but I recall having a copy of one.

(Kelly Depo. Tr. 27:3-17.)  The evidence before the Court shows that the Patent Office issued only one Office Action prior to deeming the '389 application abandoned, and the Court is satisfied that Kelly was aware of the Office Action rejecting the '389 application claims and was thus aware of the Mitchell patent as well.  One can reasonably infer that the Office Action and

13

the Mitchell patent were likely important considerations for both Kelly and TDD in determining

how to proceed on Alpert's invention in October of 1994, as Kelly was also preparing the

Amendment to the '389 application designed to overcome the examiner's findings of

unpatentability in light of Mitchell.  Due to the short period of time and the relevance of this

information, one can also reasonably infer that Kelly did not cite to the Mitchell patent or the

Office Action in the '663 application because he hoped the Patent Office would not otherwise

connect the abandoned '389 application to the '663 application.  *See Dayco Prods.,* 329 F.3d at

1367 (noting that the absence of a requirement that an applicant disclose a rejection of similar

claims by a different examiner would lead to applicants "surreptitiously fil[ing] repeated or

multiple applications in an attempt to find a friendly Examiner") (internal quotations omitted).

Despite having full knowledge of the information and being aware of its materiality,

Kelly failed to cite the Mitchell patent, the Office Action, or the Amendment at any time during

the prosecution of the '663 application.  Defendant does not dispute this, but instead argues that

Kelly sincerely believed that citing to the '389 application in the '663 Rule 47(b) Petition was

sufficient to disclose the material information to the Patent Office, and that Kelly acted "in good

faith."  Citing to another application, however, does not satisfy an individual's duty of candor to

the Patent Office.[6]  Additionally, the circumstances under which Kelly cited to the '389

---

[6]      *See McKesson,*487 F.3d at 911 (affirming a district court's decision on
inequitable conduct where the district court found that the Manual of Patent Examination and
Procedure as well as federal law "plainly imposed a duty of disclosure beyond citation of the
co-pending application").  The MPEP states that "the individuals covered by 37 C.F.R. 1.56
cannot assume that the examiner of a particular application is necessarily aware of other
applications which are 'material to patentability' of the application in question, but must
instead bring such other applications to the attention of the examiner.  *Similarly, the prior art
references from one application must be made of record in another subsequent application if
such prior art references are 'material to patentability' of the subsequent application.*"

14

application further evidence intent to deceive, rather than intent to disclose.

The first time the '389 application is referred to during the prosecution of the '663 application is in the Rule 47(b) Petition which was filed on April 10, 1995– six months *after* the '663 application was filed and just over a month after the '389 Petition to Revive was finally rejected. Moreover, Kelly did not actually cite to the '389 application at this time, but attached to the Rule 47(b) Petition a declaration of Ronald J. Larson, the individual at CAC/TDD responsible for intellectual property. Larson's declaration stated in part that "[p]ursuant to the purchase agreement CAC/TDDI entered into by Cumulus Corporation, Marvin A. Sicherman and (Exhibit A) [sic], CAC/TDDI is the owner of the subject matter of the present application." Exhibit A to the declaration is the purchase agreement between Cumulus and CAC. Attached to the purchase agreement is Schedule 2.2(c), listing the '389 application by serial number and title in a list of other intellectual property also covered by the agreement.

The Patent Office denied the Rule 47(b) Petition on September 14, 1995, in part because TDD had not shown a sufficient proprietary interest in the subject matter of the application. Kelly then responded to the decision on November 14, 1995, attaching Hoffman's declaration setting forth the chain of title of the subject matter of the '389 application and stating "the '389

---

MPEP § 2001.06(b) (emphasis added). The MPEP cites to *Armour & Co. v. Swift & Co.,* 466 F.2d 767, 779 (7th Cir. 1972) in support of this requirement: "[W]e think it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." This section of the MPEP is essentially unchanged since at least 1994. In this case, it is questionable whether the '389 application was ever brought to the attention of the examiner at all, because the Rule 47(b) Petition was considered by the Application branch of the Patent Office before the '663 application was sent to the Examination branch and assigned to Examiner Cumming.

15

application was abandoned for failure to prosecute." Thus, the status of the '389 patent was not disclosed to the patent office until more than a year after Kelly filed the '663 application. The Court also notes, however, that the Notice of Abandonment for the '389 application states that it was abandoned "in view of Applicant's failure to respond to the Office letter, mailed June 18, 1992," which refers to the Office Action. Stating that the '389 application was abandoned for failure to prosecute, while perhaps not technically incorrect, also evidences an intent to deceive in light of Kelly's awareness of the materiality of the Mitchell patent, Office Action, and Amendment. One can reasonably infer from the foregoing circumstances that Kelly did not "attempt to inform the Patent Office about the previous application even though it technically did not use the Patent Office's Information Disclosure Statement form" as defendant asserts. Instead, Kelly intended to conceal the true status of the '389 application while disclosing only the information absolutely necessary for the Rule 47(b) Petition to be granted.

Defendant emphasizes that the '389 application was actually disclosed in the Rule 47(b) Petition, and poses the following question:  "Indeed, if [Kelly] wanted to deceive the Patent Office why would he have disclosed the '389 Application in the uncooperative inventor petition?" The answer, unremarkably, is that TDD was required to show that it had a proprietary interest in the subject matter of the '663 application in order to pursue patent protection at all in this instance, and it could only show such an interest by disclosing that CAC purchased the '389 application from Cumulus, it was subsequently assigned to TDD, and that the subject matter of the '389 application and the '663 application were the same.[7]

---

[7]        Defendant also argues that Kelly's actions demonstrate "exactly the opposite" of intent to deceive, stating that "Micral first tried to revive the earlier application and filed the application for the patent in suit only when those attempts failed." This statement is

Finally, defendant points to Kelly's testimony to support its argument that Kelly sincerely believed he had satisfied his duty of candor to disclose the material information to the Patent Office by disclosing the '389 application in the Rule 47(b) Petition.  Defendant characterizes Kelly's testimony as showing that "he clearly thought he was meeting the duty of disclosure and that he was not hiding anything from the Patent Office.  His belief is further bolstered by his agreement that the '389 Application was material and that he thought he disclosed it in an appropriate way."  The Court, however, finds that Kelly's deposition testimony does not reflect Kelly's alleged sincere belief that he appropriately disclosed the material information.  Kelly testified to the following:

    Q.    Explain your decision-making process not citing these two references [the Mitchell patent and the Drori patent] to the patent office?

    A.    I don't recall that process at all.

          *     *     *
    (Whereupon, an off-the-record discussion was had.)
          *     *     *

    Q.    Were they considered?

    A.    By the examiner?

          *     *     *
    (Whereupon, an off-the-record discussion was had.)
          *     *     *

    Q.    Did you consider citing these references to the patent office and decided [sic] not to?

    A.    I don't recall, but almost certainly not.

---

inaccurate:  the '663 application was filed on October 5, 1994 and the '389 Petition to Revive was filed on October 24, 1994.

Q.     Why do you say "almost certainly not?"

A.     If– well, if I considered them, I would probably have cited them.

Q.     Is it your normal practice to– to consider references that were– strike that.

    *      *      *
(Whereupon an off-the-record discussion was had.)
    *      *      *

Q.     So you don't believe that you considered those two references?

Mr. Carlson:     Objection.  The witness said he doesn't remember. You can't get any different than that.

Mr. Jakubowski:     But you were aware of those references during the prosecution of the '663 application?

A.     I don't– I don't remember being aware of them at the time. If– I mean I don't remember that (witness indicating).

    *      *      *
(Whereupon, an off-the-record discussion was had)
    *      *      *

Q.     But you don't dispute that those references were cited in documents that you had copies of at the time, for example, the office action?

A.     It appears that way, yep.

(Kelly Depo. Tr. 53:13-55:18.)  Kelly thus testified that he did not remember whether he was even aware of the Mitchell patent at the time.  Kelly further testified:

Q.     Is it your position that you're relying upon the examiner to review the contents of the '389 application to satisfy your duty of candor and disclosure obligations to the patent office?

> Mr. Carlson:  So tell him what you recall about your thought process in connection with the recitation of the '389 application.
>
> A.  I recall that we cited it to the examiner.  I recall that we told him, to our knowledge, it was abandoned for failure to respond, and I guess that's what– that's what we told him.

(Kelly Depo. Tr. 62:25-63:13).  Far from conclusively establishing that Kelly sincerely believed he provided the necessary information to the examiner, Kelly's testimony is not responsive to the question posed, nor is it accurate when compared with the patent's prosecution history.[8]

The Court also finds defendant's argument that Kelly truly believed he disclosed all material information to the examiner to lack plausibility in light of Kelly's response to Examiner Cumming's restriction requirement for the '663 application.  Kelly elected to proceed with claims 1-22, stating that he believed the claims were allowable over the art of record.  These claims, however, were identical to the claims rejected in the '389 Office Action based on the Mitchell patent or the Mitchell patent combined with the Drori patent.  Kelly could not have stated that the claims were allowable over the art of record if he truly believed he had made the Mitchell patent "of record" by citing it in the Rule 47(b) Petition.  Moreover, the Federal Circuit has found that the deceptive intent element is met where an applicant withholds references and makes an argument for patentability that could not be made if the art were disclosed.  *Monsanto Co.,* 514 F.3d at 1241 ("Intent is easily inferred when, as here, an applicant makes arguments to the [Patent Office] that it knows, or obviously should have known, are false in light of

---

[8]     The Court also finds defendant's argument to lack plausibility in light of Kelly's testimony that he would normally file an Information Disclosure Statement to cite a reference upon which the same claim had been rejected in a previous application.  (Kelly Depo. Tr. 24:16-25:3).

information not before the examiner, and the applicant knowingly withholds that additional information."); *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1275 (Fed. Cir. 2001) (citing *LaBounty Mfg., Inc. v. United States Int'l Trade Comm.,* 958 F.2d 1066, 1076 (Fed. Cir.1992)). Essentially, Kelly engaged in the same behavior in this case by failing to cite the material information to the examiner and then making an argument for patentability that could not have been made if the Mitchell patent, Office Action, and Amendment had been disclosed. Additionally, when claims 1-22 were rejected by Examiner Cumming on October 22, 1996, the Mitchell patent was not listed among either the references relied upon by him or among the prior art of record not relied upon, further undercutting defendant's argument.

Accordingly, the Court finds that the plaintiff has shown by clear and convincing evidence that Kelly intended to deceive the Patent Office when he failed to cite to the Mitchell patent, the Office Action, and the Amendment in the '663 application.

## C.   Balancing Materiality and Intent

Once a court has determined that the accused infringer has shown both materiality and intent to deceive by clear and convincing evidence, the court must balance materiality and intent in light of all of the circumstances to determine whether the conduct is so egregious as to warrant holding the patent unenforceable.  *Star Scientific,* 537 F.3d at 1365.  When balancing the equities, "[t]he more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed. Cir. 1991).  The Court finds that the Mitchell patent, Office Action, and Amendment are highly material because this information discloses a contrary decision and conflicting arguments by the same patent counsel on exactly the same claims.  The Court also finds that Kelly's inequitable conduct was

20

not limited to a single instance and represents a pattern of intentional deception in his conduct before the Patent Office in this matter, from failing to disclose the material information when the '663 application was filed to mischaracterizing the status of the '389 application in the Rule 47(b) petition to arguing that claims 1-22 were allowable over the art of record when he knew material information was not properly of record.  Defendant's good-faith argument related to the disclosure of the '389 application in the Rule 47(b) petition appears to be an explanation manufactured with the benefit of hindsight, and is unsupported by Kelly's testimony and by the facts in this case.  Accordingly, the Court finds that the conduct in this case is egregious enough to warrant holding the patent to be unenforceable.

### **CONCLUSION**

For the foregoing reasons, U.S. Patent No. 5,742,666 is UNENFORCEABLE due to inequitable conduct.  Count 1, for a declaratory judgment of patent invalidity, and Count 3, for a declaratory judgment of non-infringement, of the Second Amended Complaint are hereby DISMISSED and defendant's Counterclaim for infringement is hereby DISMISSED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 4/7/10