**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Onstar, LLC,** | ) | **CASE NO. 1:08 CV 2047** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Micral, Inc., et al.** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |


### INTRODUCTION

This matter is before the Court upon plaintiff's Motion for Attorney's Fees (Doc. 89).
This is a patent infringement dispute.  For the reasons set forth below, plaintiff's motion is
GRANTED in part and DENIED in part.

### FACTS

Plaintiff, OnStar, LLC, brings this action against defendants, Micral, Inc. (hereinafter
"defendant"), the assignee of U.S. Patent No. 5,742,666 (hereinafter "the patent"), and Martin
Alpert, the inventor of the subject of the patent.  The Court granted Alpert summary judgment on
the claims against him in its February 24, 2010 Memorandum of Opinion and Order (Doc. 85).

1

The Court also found the patent to be unenforceable due to inequitable conduct in its April 7,

2010 Memorandum of Opinion and Order (Doc. 87).  The facts of this case were set forth in the

Court's April 7 Memorandum and are repeated below for convenience.

> The patent claims an emergency mobile cellular telephone system.  The telephone system dials a preprogrammed emergency telephone number based upon either user inputs to the system or when the system senses a vehicle accident.  Once the system connects to the emergency telephone number, the system repeatedly plays a prerecorded emergency message.  The user has the option of interrupting the emergency message and speaking directly to the person contacted by dialing the preprogrammed emergency number.  The telephone system also includes a location detector and distress signal generator that locates the telephone in an emergency and can notify the nearest emergency responder. The patent further claims configurations of different types of crash detectors.
> Claim 1 of the patent is representative:

> A cellular telephone, comprising:

> a receiver for receiving cellular radio communications;

> a transmitter for transmitting cellular radio communications;

> a controller coupled to the receiver and to the transmitter;

> an operator input device coupled to the controller, the operator input device receiving operator inputs and providing operator input signals to the controller indicative of the operator inputs;

> an emergency input key coupled to the controller, the emergency input key receiving an operator emergency input and providing an emergency input signal to the controller indicative of the operator emergency input;

> a crash detector, coupled to the controller, sensing parameters indicative of a crash and providing a crash signal to the controller indicative of the parameters sensed;

> a first memory coupled to the controller and storing

2

a pre-programmed telephone number
corresponding to an emergency responder;

a second memory coupled to the controller and
storing a pre-recorded emergency message
including identification information
associated with a user of the cellular
telephone;

a microphone coupled to the controller and
providing voice signals to the controller in
response to the user speaking into the
microphone;

wherein the controller is configured to detect a
distress situation based on inputs from the
emergency input key and the crash detector,
and to access the first memory and initiate
cellular communication using the pre-
programmed telephone number and to
access the second memory and play the pre-
recorded message repeatedly once cellular
communication has been initiated and
established with the emergency responder,
and wherein the controller is further
configured to stop playing the pre-recorded
message and transmit voice information
based on inputs from the microphone and
the operator input device.

The Court construed the following claim terms in its August 21, 2009 order:
"emergency responder" is construed as "the person or entity contacted by dialing
the pre-programmed emergency number"; and "pre-recorded emergency
message" is construed as "pre-recorded emergency voice message." [(Doc. 60.)]

The following facts are taken from plaintiff's Statement of Undisputed
Material Facts Concerning the Issue of Inequitable Conduct (Doc. 76) and its
supporting exhibits, with which defendant has indicated it agrees.  The patent
issued on April 21, 1998, following two separate applications.  Cumulus Corp., to
whom Alpert assigned the patent application, first applied for a patent on Alpert's
invention on November 19, 1991, through its counsel Renner, Otto, Boiselle &
Sklar.  The Patent Office assigned the application serial number 07/794,389
(hereinafter "the '389 application").  The Patent Office rejected all 31 claims of
the '389 application in an Office Action dated June 18, 1992.  The examiner,

Stella Woo, found that claims 1-4 and 9-12 were unpatentable because they were anticipated by U.S. Patent No. 4,904,983 (hereinafter "the Mitchell patent"); that claims 5-8 were unpatentable because they were obvious in light of the Mitchell patent; and that claims 13-31 were unpatentable because they were obvious in light of the Mitchell patent combined with U.S. Patent No. 5,081,667 (hereinafter "the Drori patent"). The Patent Office gave Cumulus three months to respond to the Office Action. Cumulus's attorney notified it of the rejection and suggested that Cumulus amend the claims, but Cumulus failed to respond to the Office Action due to financial troubles. The Patent Office issued a Notice of Abandonment of the '389 application on January 25, 1993.

While the '389 application was pending, Cumulus filed for bankruptcy. Controller Acquisition Corporation (hereinafter "CAC") purchased the abandoned '389 application from the assets of Cumulus. CAC subsequently changed its name to Tele Digital Development, Inc. (hereinafter "TDD"). TDD hired patent counsel in early 1994 to work on the abandoned '389 application. Joseph Kelly of Westman, Champlin and Kelly filed a new patent application with serial number 317,663 (hereinafter "the '663 application") for TDD on October 5, 1994, with exactly the same claims as the '389 application. Rudolph Hoffmann assisted Kelly in prosecuting the '663 application.

Nineteen days later, on October 24, 1994, Kelly petitioned the Patent Office to revive the '389 application based on unavoidable abandonment, and included an Amendment responding to the June 18, 1992 Office Action. The Amendment amended claims 1-12, 14-23, and 25-31, and canceled claims 13 and 24. The Amendment stated "[i]t is believed that the present invention, as set out in the amended claims, is clearly distinguishable over Mitchell." The Petition to Revive was ultimately rejected by the Patent Office's Special Program Law Office on March 31, 1995.

Because Alpert, the inventor, refused to participate in prosecuting the '663 application, on April 5, 1995, Kelly filed a Petition to Make Application on Behalf of and as Agent for Sole Inventor Who Refuses to Sign under 37 C.F.R. § 1.47(b) (hereinafter "the Rule 47(b) Petition"). He attached to the Rule 47(b) Petition a declaration to which was attached the purchase agreement between Cumulus and CAC for the '389 application and other assets. The Application Branch of the Patent Office initially refused Rule 47(b) status on September 14, 1995, as TDD failed to show a sufficient proprietary interest in the subject matter of the '663 application because the purchase agreement referred to the '389 application, not the '663 application. Kelly responded to the Patent Office's decision on November 15, 1995, by submitting Hoffmann's supplementary declaration describing the chain of title of the '389 application and asserting that the subject matter of the '389 application and the '663 application are the same. Hoffmann also stated in the declaration that he had been involved in the

4

prosecution of the '389 application.  On May 13, 1996, the Special Program Law
Office of the Patent Office granted status under Rule 47(b) and authorized the
Application Branch to pass the '663 application to the Examination Branch,
where it was assigned to Examiner William Cumming.

On August 2, 1996, the Patent Office issued an Office Action requiring
TDD to restrict its application to claims 1-22 or to claims 23-31, as Examiner
Cumming found that two different inventions were claimed.  Kelly responded by
electing examination of claims 1-22.  All claims were rejected by the Patent
Office on October 22, 1996, as being anticipated by or unpatentable over existing
patents.  Examiner Cumming did not cite the Mitchell patent in the rejection.
Kelly filed an amendment in response to the Office Action on April 22, 1997,
canceling claims 1-22 and adding new claims 32-40.  The Patent Office issued a
Notice of Allowability for claims 32-40, renumbered as claims 1-8, and on April
21, 1998, the '663 application issued as the patent.  While the '663 application
was pending, neither Kelly nor anyone else cited the Mitchell patent to the
examiner.  TDD subsequently assigned the patent to defendant.

(Doc. 87.)

The following facts are also relevant to the instant motion.  Plaintiff subpoenaed

documents relating to the prosecution of the '663 Application and the '389 Petition to Revive

from Kelly and his law firm on or about September 17, 2009.  Kelly then contacted defendant's

attorneys seeking representation in connection with responding to the subpoena.  Based on the

attorneys' conversation with Kelly, the attorneys determined that Kelly's interests were aligned

with defendant's interests and agreed to represent him in connection with the subpoena and

plaintiff's deposition of Kelly.  Kelly then indicated the file was being retrieved from storage and

that he would send it to defendant's attorneys for review and production.  In October 2009,

Kelly's law firm sent a copy of the file to defendant's attorneys.  Defendant's attorneys reviewed

the file and determined that the statements made by Kelly during the conversation in which he

sought representation were materially different from what the contents of the file revealed.  The

attorneys advised Kelly that they could not represent him in connection with this matter.

5

Defendant's attorneys sent the file back to Kelly's firm.  Defendant's attorneys sought permission to withdraw from the case, to which plaintiff objected and which the Court ultimately denied.  Kelly's new attorney then objected to producing the documents based on the attorney-client privilege held by defendant.  Plaintiff filed a motion to compel production of the documents, which was unopposed by defendant and granted by the Court.  The documents were then produced to plaintiff.

Plaintiff now moves for an award of attorney's fees under 35 U.S.C. § 285 on the grounds that this is an exceptional case.  Plaintiff also moves for sanctions against defendant's attorneys under 28 U.S.C. § 1927 and the Court's inherent authority to award sanctions.  Defendant opposes the motion.

### LAW AND ANALYSIS

**A.     Award of Attorney's Fees Under 35 U.S.C. § 285**

Under 35 U.S.C. § 285, a district court may award attorney's fees in a patent case only if the case is "exceptional," the moving party "prevailed" in the action, and the fees awarded are "reasonable."  *See also Mach. Corp. of Am. v. Gullfiber*, 774 F.2d 467, 470 (Fed. Cir. 1985).  The prevailing party must establish the exceptional nature of the case by clear and convincing evidence.  *Id.* at 471.  Even if the case is deemed exceptional, the decision whether or not to award fees lies within the district court's discretion.  *Id.*

"Exceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee in procuring the patent."  *Brasseler, U.S.A., I., L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1380 (Fed. Cir. 2001) (citing *Cambridge Prods. Ltd. v. Penn Nutrients Inc.,* 962 F.2d 1048, 1050-51 (Fed. Cir. 1992)).  "The prevailing party may prove the

existence of an exceptional case by showing:  inequitable conduct before the PTO; litigation
misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful
infringement."  *Id.* (citing *Hoffman-La Roche Inc. v. Invamed, Inc.,* 213 F.3d 1359 (Fed. Cir.
2000)).  "Litigation misconduct and unprofessional behavior are relevant to the award of
attorney fees, and may suffice, by themselves, to make a case exceptional."  *Id.* (citing
*Sensonics, Inc. v. Aerosonic Corp.,* 81 F.3d 1566, 1574 (Fed. Cir. 1996)).  In determining
whether to award attorney's fees, courts must weigh factors such as degree of culpability,
closeness of the questions, and litigation behavior.  *Nilssen v. Osram Sylvania, Inc.,* 528 F.3d
1352, 1359 (Fed. Cir. 2008).

Plaintiff presents a variety of reasons why the Court should find this case to be
exceptional.  Plaintiff first argues that defendant knew or should have known of attorney Joseph
Kelly's misconduct before the Patent Office and thus should have known that the patent was
likely unenforceable.  In support, plaintiff claims that Kelly's file, which contained the
documents supporting the Court's finding of inequitable conduct, was in defendant's control
prior to defendant approaching plaintiff and claiming infringement.

Plaintiff also argues that defendant was manifestly unreasonable in asserting
infringement.  Plaintiff claims that defendant's initial patent claim chart presented to plaintiff
prior to the suit consisted of statements that were unsupported by any OnStar documentation, test
results, or experimental data regarding the operation of the OnStar system.  Plaintiff also claims
that defendant's document production relating to its pre-filing investigation consisted of
documents acquired after defendant filed its infringement claim, showing that defendant lacked
an understanding of how the OnStar system worked and that it did not conduct the discovery

necessary to reasonably investigate its infringement claim.  Plaintiff further argues that following the Court's claim construction, defendant continued to assert infringement based on the doctrine of equivalents, an argument plaintiff claims is impermissible in the context of the Court's claim construction under the doctrine of claim vitiation.

Finally, plaintiff argues that defendant's infringement allegations were unreasonably broad in light of the prior known art.  In support, plaintiff points both to the testimony of Charles Smoot, defendant's 30(b)(6) witness, who failed to provide any response to plaintiff's invalidity arguments during his deposition, and to its expert's report on invalidity, which it claims defendant did not rebut.

Defendant responds that there is no per se rule that a finding of inequitable conduct makes a case exceptional, and that cases are generally found exceptional based on the conduct of the patent owner-party.  Defendant argues that there is no evidence that defendant knew or should have known about Kelly's misconduct before the Patent Office.  In support, defendant points out that defendant did not own the patent until after it was issued and there is no evidence that TDD or Smoot committed inequitable conduct.  Additionally, the '389 Petition to Revive, the key document supporting the finding of inequitable conduct, could only be found in Kelly's file, not defendant's file.  Thus, defendant argues, the case is not exceptional under § 285.

Defendant also argues that it performed an adequate pre-suit investigation into how the OnStar system operated, pointing to the pre-suit conversations between Martin Alpert and an OnStar attorney and the claim chart previous counsel drafted for defendant that was provided to OnStar.  Defendant claims it continued its investigation after the suit was filed and provided plaintiff with a very detailed infringement chart in response to plaintiff's first set of

8

interrogatories.

Defendant further argues that it reasonably maintained its claim of infringement under the doctrine of equivalents following the Court's claim construction.  As to plaintiff's arguments that defendant's assertions of infringement were unreasonably broad in light of known prior art, defendant argues that it is not required to rebut plaintiff's expert report, and it is plaintiff's burden to prove invalidity by clear and convincing evidence.

In reply, plaintiff asserts that while defendant may not have had possession of Kelly's file relating to the '389 Petition to Revive, it certainly had exclusive control over the file since it acquired the rights to the patent in 1998.  Plaintiff argues that defendant exerted that control when it objected to plaintiff's subpoena of Kelly's documents.[1]  Plaintiff also cites to Smoot's testimony that defendant actually paid for the prosecution of the applications related to the patent.

Plaintiff additionally asserts that defendant and its attorneys had a duty to investigate plaintiff's claims of inequitable conduct by reviewing Kelly's file, but that defendant instead denied the allegations and did not review the file until approximately two months later, at which time defendant's attorneys realized that an inequitable conduct issue existed and attempted to withdraw from their representation of defendant.  Plaintiff argues that defendant's attorneys' motion to withdraw is an admission that defendant failed to conduct a reasonable investigation prior to asserting claims of infringement.

Finally, plaintiff argues that defendant's allegations of infringement by equivalents

---

[1]        Despite plaintiff's argument, the objection to the subpoena was filed by Kelly's attorney, not defendant or defendant's attorneys.

9

address only the term "message" and fail to address the single emergency cellular telephone call context required by the claims.  Plaintiff argues that this demonstrates defendant's infringement claim is brought in bad faith.

Upon review, the Court finds that this case is exceptional.  Plaintiff has already proven inequitable conduct by clear and convincing evidence in this matter.  Although defendant argues that Kelly's inequitable conduct cannot be attributed to defendant, as defendant did not own the patent until after it was issued, and "there is no claim or evidence that anyone at TDD itself, including Mr. Smoot, committed inequitable conduct either,"  the argument is not well-taken.  It is well-settled that "the knowledge and actions of applicant's attorney are chargeable to applicant."  *FMC Corp. v. The Manitowoc Co.,* 835 F.2d 1411, 1415 (Fed. Cir. 1987) (citing *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.,* 759 F.2d 10, 14-15 (Fed. Cir. 1985)).  Thus, Kelly's inequitable conduct is TDD's inequitable conduct.  Further, defendant's argument that TDD's inequitable conduct may not be attributed to defendant ignores the very close relationship between TDD and defendant.  It even ignores defendant's own characterization of TDD's actions as those of defendant, as shown in its brief in opposition to plaintiff's request for entry of judgment of unenforceability due to inequitable conduct:

> ***Micral*** did not deceive the Patent Office at all; it simply failed to file the proper form notifying the Patent Office of a prior patent application. Touting the materiality of ***Micral's*** clerical omission, however, OnStar's brief seems to argue that this Court's inquiry—and Micral's patent rights—should end there. Not so. As OnStar's repeated attempts to gloss over intent make clear: OnStar cannot demonstrate that ***Micral*** intended to deceive the Patent Office by hiding the existence of a prior patent application. Indeed, ***Micral's*** actions evince exactly the opposite. ***Micral*** first tried to revive the earlier application and filed the application for the patent in suit only when those attempts failed. Moreover, ***Micral*** expressly informed the Patent Office of the earlier application and

10

> relied on it in a petition filed in the patent in suit. ***Micral's*** only
> failure was in neglecting to file a separate document again
> disclosing the earlier application. Without question, ***Micral***
> informed the Patent Office of the earlier application—it just did so
> in a technically improper manner.

(Doc. 81, p. 2 (emphasis added; original emphasis deleted).)

The evidence in this case shows that defendant was well aware of the prosecution of the

'663 Application and the '389 Petition to Revive, despite TDD being listed as the owner and the

applicant.  Smoot, defendant's majority shareholder since 1988 and currently defendant's sole

shareholder, testified that he operated TDD out of the same office as he operated defendant, that

he was chairman of TDD's board in 1998 at the time the patent was assigned to defendant, and

that he maintained a titled position in TDD until 2002 or 2003.  (Smoot Depo. 20:14-21:6; 73:6-

20.)  Defendant hired Kelly's firm to do the work on the '663 Application and '389 Petition to

Revive.  (Id. at 60:20-61:15.)  He also testified that defendant "filed [the '663 Application] and

prosecuted the patent and did the work" along with paying the legal bills from Kelly's firm.  (Id.

at 76:10-25.)  Further, Smoot testified that the patents purchased from Cumulus were always

intended to be defendant's patents:

> Q.     Okay.  Why did you select these patents and these
>        applications to be transferred from Tele Digital to Micral?
>
> A.     Because they were never Tele Digital's in the first place.
>
> Q.     Whose were they?
>
> A.     Micral's.
>
> Q.     So Micral, through that asset acquisition company, had
>        paid the money to buy them from Cumulus?
>
> A.     Yes, yes.  And the patents that as we split it off and
>        financed it, that was agreed to go with Tele Digital were

11

the ones related to its debit cellular technology.  This was not our thing and they could not even at this point afford to pay for them so we fixed it.

Q.     So this assignment in July 22nd of '98 would have been prior to the venture capital guys getting involved?

A.     I don't know.

Q.     About the same time then or --

A.     Vaguely.

Q.     But the reason for doing it was that the venture capital guys were pursuing the debit cellular portion of the business and you didn't believe this related to it?

A.     No.  Specifically it didn't.  Most of these were related to the controllers and other pieces.  The only reason that they have any association with Tele Digital was I believe somebody changed game plans and instead of incorporating Tele Digital as a separate entity, I believe they did something where they actually used the CAC corporate shell.

(Id. at 74:19-76:3.)  Smoot also testified that he was aware of the '389 Petition to Revive, and although he did not have conversations about it with Kelly directly, he recalled talking about it with his "inside guy."  (Id. at 63:2-9).  He further testified that defendant paid for the Petition to Revive, that he instructed the individual who did all of his patent work to do whatever he could to preserve the intellectual property, and that he was aware that Kelly's law firm was prepared to file a new application.  (Id. at 68:10-69:6.)  Defendant and TDD appear to have been inextricably intertwined during the time the '389  Petition to Revive and the '663 Application were filed, and under these particular circumstances the Court finds that defendant is chargeable with Kelly's knowledge and actions.  The inequitable conduct is sufficient to make this case exceptional.  *See Nilssen,* 528 F.3d at 1358.  Accordingly, the Court finds this case to be exceptional due to

inequitable conduct.[2]

The Court also finds that it is appropriate to award reasonable attorney's fees to plaintiff under § 285 due to the degree of defendant's culpability and the lack of closeness of the case. Although defendant continues to assert that the evidence supports an argument that Kelly acted in good faith in failing to disclose the Mitchell patent, defendant has produced absolutely no evidence of good faith, and the Court has already found that the evidence in this case points to intent to deceive, rather than good faith.  Similarly, the lack of any evidence of good faith whatsoever shows that the question of inequitable conduct was not a close one.[3]  Accordingly, under these circumstances, the Court finds an award of reasonable attorney's fees to be warranted.  Plaintiff is hereby directed to submit a detailed accounting of attorney's fees with supporting documents within 10 days of the entry of this Memorandum of Opinion and Order. In accordance with the statute, plaintiff must show that the fees requested are reasonable. Defendant's response must be filed within 14 days of plaintiff's submission.

**B.      Sanctions Under 28 U.S.C. § 1927 and the Court's Inherent Authority**

---

[2]      The Court finds that plaintiff has not presented clear and convincing evidence that this case is exceptional based on its arguments relating to the reasonableness of defendant's infringement claim, including assertion of infringement by equivalents and infringement in light of prior art.  Indeed, arguments relating to infringement and the doctrine of equivalents have not been presented to the Court outside the context of the instant motion, and are not fully developed in the parties' briefs.  Similarly, the Court finds that plaintiff has not presented clear and convincing evidence that this case is exceptional due to defendant's alleged failure to conduct an adequate pre-suit investigation into its claim of infringement.

[3]      Although plaintiff also argues defendant engaged in litigation misconduct because it failed to appropriately investigate its claim of infringement prior to contacting plaintiff and because it continued to assert infringement under the doctrine of equivalents after the Court's claim construction, the Court finds that these arguments are not adequately supported by the record.  *See supra* Note 2.

13

An attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.   "The proper inquiry is not whether an attorney acted in bad faith; rather, a court should consider whether 'an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.'"  *Hall v. Liberty Life Assurance Co. of Boston,* 595 F.3d 270, 275-276 (6th Cir. 2010).  The accused conduct must be objectively improper:  "There must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party."  *Ridder v. City of Springfield,* 109 F.3d 288, 289 (6th Cir. 1997).

Plaintiff argues that defendant's attorneys withheld key documents supporting inequitable conduct by objecting to the production of documents relating to the patent prosecution on the basis of attorney-client privilege.  Such an objection, plaintiff argues, was meritless because the documents in question had already been disclosed to the Patent Office.  Plaintiff also argues that defendant's attorneys willfully ignored the Court's claim construction by arguing that the OnStar system met the "voice message" limitation under the doctrine of equivalents, contrary to the doctrine of claim vitiation.  Plaintiff argues that these actions show that defendant's attorneys continued to prosecute defendant's infringement claim with reckless indifference to whether plaintiff infringed the patent and in light of compelling evidence that the patent was unenforceable due to inequitable conduct.  Plaintiff also argues that the Court has the

14

inherent power to sanction attorneys who engage in bad faith conduct, and that the Court should do so here.

Defendant's attorneys respond that they attempted to withdraw from the case, but plaintiff objected, and plaintiff cannot now complain that they remained in the case. Defendant's attorneys also argue that their actions in withholding certain documents were proper under the Ohio Rules of Professional Conduct given that the attorneys had agreed to represent Kelly at that time, and that they were required to take reasonable steps to protect Kelly's interests when they determined that the interests of defendant and Kelly were not aligned and that they could no longer represent Kelly. Defendant's attorneys also point out that it was in fact Kelly's subsequent counsel who claimed privilege over the documents and objected to producing them. Defendant's attorneys further argue that there was only a brief delay between the time they returned the files to Kelly and when the files were produced by Kelly's subsequent attorney, and that they did not oppose plaintiff's motion to compel those documents. Finally, defendant's attorneys claim that they attempted to resolve the litigation in the most expeditious manner possible by suggesting to plaintiff that the inequitable conduct issue be tried to the Court on the briefs.

In its reply, plaintiff argues that defendant's attorneys withheld patent prosecution documents throughout the litigation, because defendant obtained control of Kelly's file when it obtained rights to the patent in 1998, regardless of whether the file remained in Kelly's possession. Plaintiff also argues that defendant's attorneys did not properly investigate the circumstances of plaintiff's inequitable conduct allegation prior to denying it. Plaintiff points to defendant's attorneys' motion to withdraw in support of this argument.

15

Upon review, the Court finds that sanctions under 29 U.S.C. § 1927 are not warranted, as plaintiff has not shown that these proceedings were "unreasonably and vexatiously multiplied." Although plaintiff contends that defendant's attorneys improperly pursued the infringement claim based on an erroneous application of the doctrine of equivalents after the Court's claim construction, this argument is not well-taken for the reasons discussed in § A, note 2.

Following claim construction, the only proceeding of real significance other than plaintiff's motion to compel was the briefing on inequitable conduct.  Plaintiff argues that defendant's attorneys failed to conduct a reasonable investigation into the claims of inequitable conduct prior to denying the allegation, but the fact that an attorney may have failed to "undertake a reasonable inquiry into the basis for a claim does not automatically imply that the proceedings were intentionally or unreasonably multiplied." *Ridder,* 109 F.3d at 298.  Even so, defendant's attorneys presented evidence to the Court in their Ex Parte, Under Seal Response Regarding Motion of Defendants' Counsel to Withdraw (Doc. 68) that indicates they performed a reasonable investigation of the inequitable conduct claim prior to denying the allegation. Based on information obtained subsequent to the investigation, defendant's attorneys attempted to withdraw from representation prior to the inequitable conduct briefing, but plaintiff objected.

Defendant's attorneys' conduct in withholding Kelly's file also does not rise to the level of warranting sanctions under § 1927.  The attorneys thoroughly explained their reasoning for sending the documents back to Kelly after determining that they could no longer represent him, and the Court accepts this explanation as reasonable.  Moreover, the record reflects that it was Kelly's subsequent counsel who objected to producing the documents, and that defendant's attorneys did not object to plaintiff's motion to compel.  Accordingly, plaintiff's motion for

attorney's fees under § 1927 is denied.[4]

**CONCLUSION**

For the foregoing reasons, plaintiff's Motion for Attorney's Fees is GRANTED in part and DENIED in part.  Plaintiff must submit a detailed accounting of attorney's fees with supporting documents and a brief addressing reasonableness of the fees within 10 days of the entry of this order.  Defendant's response is due within 14 days of plaintiff's submission.

IT IS SO ORDERED.


 /s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Date: 7/12/10

---

[4]     Plaintiff has presented no convincing evidence of bad faith; accordingly, plaintiff's request for the Court to award fees based on the Court's inherent authority is denied.  Additionally, plaintiff requests in a footnote in its reply brief that the Court award Rule 11 sanctions against defendant's attorneys for failing to properly investigate.  To the extent that such a request is a motion for Rule 11 sanctions, it is denied for the reasons stated in this Memorandum of Opinion and Order.

17